IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 20, 2017

**STATE OF TENNESSEE v. TARIS C. FRAZIER**

**Appeal from the Circuit Court for Rutherford County**
**No. F-73323     David M. Bragg, Judge**

---

**No. M2016-02397-CCA-R3-CD – Filed November 8, 2017**

---

The Defendant, Taris C. Frazier, was convicted by a Rutherford County Circuit Court jury of three counts of especially aggravated kidnapping, Class A felonies; three counts of aggravated assault, Class C felonies; resisting arrest, a Class B misdemeanor; and criminal impersonation, a Class B misdemeanor. He was sentenced to an effective term of seventy-five years in the Tennessee Department of Correction, to be served consecutively to his sentence in another case. On appeal, he challenges the sufficiency of the evidence convicting him of especially aggravated kidnapping and aggravated assault. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

ALAN E. GLENN, J., delivered the opinion of the court, in which ROBERT H. MONTGOMERY, JR., and TIMOTHY L. EASTER, JJ., joined.

R. Wilford Fraley, III (on appeal and at sentencing), and Jimmy Turner and Rebecca Lashbrook (at trial), Murfreesboro, Tennessee, for the appellant, Taris C. Frazier.

Herbert H. Slatery III, Attorney General and Reporter; Clark B. Thornton, Senior Counsel; Jennings H. Jones, District Attorney General; and Sarah N. Davis and Matthew W. Westmoreland, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

## FACTS

The Defendant was indicted for the especially aggravated kidnappings and aggravated assaults of Amber Waight, Lauren Oldfield, and Teresa Ring, as well as resisting arrest, criminal impersonation and theft of property,[1] as a result of events that occurred during the late evening and early morning hours of October 28 and 29, 2014, at a home on East Castle Street in Murfreesboro, Tennessee.

### State's Proof

Kristi Wells, a police dispatcher in Murfreesboro, testified that the police department received two 911 calls from a cell phone in the area of East Castle Street at 4:13 and 4:20 a.m. on October 29, 2014. On the first call, the dispatcher "could hear a female whispering 'send the police.'" Dispatchers were unable to get an exact location of the first call, and the more specific location of the second call came back to a vacant lot. Another call came in from the manager of the McDonald's restaurant on Broad Street at 5:28 a.m., reporting that a woman was standing at the drive-through window and yelling that she needed the police. Officers responded to the McDonald's and located the woman nearby, and she informed them of the address on East Castle Street where they were needed.

Jessica Cooper, a night-shift manager at the McDonald's, testified that around 5:20 a.m. on October 29, 2014, she was standing near the front counter of the restaurant when she saw a woman banging on the drive-through window. The woman was "screaming and crying, saying that she had been held hostage" and asked them to call the police. Ms. Cooper called the police and went outside to look for the woman, but she could not locate her.

Yachika Murray testified that around 9:30 or 10:00 p.m. on October 28, 2014, she went to the East Castle Street residence to drink beer and smoke marijuana with her acquaintance, Teresa Ring, and two other women whom she had known for about a week, Amber Waight and Lauren Oldfield. The women were in the living room, which was in the front of the house. Ms. Ring told them that someone was coming to the house later and that, when that person got there, they would have to go to the back bedroom. Around midnight, someone knocked on the door, and the women went to the back room while

---

[1] A judgment dismissing the theft of property charge was filed on September 2, 2016.

Ms. Ring "let the people in the house." At that time, Ms. Murray did not see who came in the house or if that person was alone.

Ms. Murray said that Ms. Ring came in the back bedroom followed by the Defendant, whom she had known for more than twenty years, and she and the Defendant greeted one another. The Defendant and Ms. Ring then left the room, while Ms. Murray and the other two women sat there talking. At some point, Ms. Ring came back and smoked with them. Ms. Ring then returned to the living room. Ms. Murray did not know what Ms. Ring said or did while in the living room.

Ms. Murray testified that Ms. Ring again came back to the bedroom, followed by the Defendant who "was real mad." The Defendant shut the door and told the women to move away from the door. He told Ms. Murray not to let anyone leave or "it's going to be my ass." The Defendant held a knife to Ms. Ring's throat and cursed at her to "shut . . . up . . . or he would cut her throat." The Defendant "kept asking her, are you going to treat me like that after all I have done for you[?]" Seeing the Defendant with a knife, Ms. Murray was "scared" and felt threatened. Ms. Ring kept screaming and crying, and the Defendant hit and punched her in the face. Ms. Murray was trying not to watch, so she was uncertain about how many times the Defendant hit Ms. Ring. She also saw the Defendant hit Ms. Oldfield "for some reason." Ms. Oldfield was crying and trying to talk to the Defendant, but "he wasn't trying to hear nothing." Ms. Murray tried to get the Defendant to stop, but he told her to sit down and let him handle it. Ms. Waight stood in a corner behind a dresser, appearing to be "[s]cared." The Defendant left Ms. Waight alone because she was quiet, and one of the other women told him that Ms. Waight was pregnant. Ms. Murray did not recall the Defendant having a beer bottle in his hands or threatening the women with a beer bottle. She never heard him mention a gun. Ms. Murray did not see any of the women hit or do anything to the Defendant.

Ms. Murray testified that the Defendant did not let anyone leave the room to go to the bathroom, and, in fact, Ms. Oldfield had to urinate in the closet. Although she could not recall, Ms. Murray speculated that the Defendant must have left the room at some point because she left the room to use the bathroom. After sitting in the living room "for a minute," she ran out the back door of the house sometime between 2:30 and 4:00 a.m. The other three women remained in the bedroom, crying and scared, and she thought the Defendant might have been back in the bedroom by that point. Ms. Murray ran to her mother's house, which was not far away. She did not call the police or do anything because she "[f]roze" and "was just afraid of everything."

On cross-examination, Ms. Murray agreed that a woman was with the Defendant when he came to the house that night and that he gave Ms. Ring crack cocaine, which

Ms. Ring and Ms. Oldfield smoked. The Defendant's female friend left the house sometime before the Defendant came to the back bedroom.

The preliminary hearing testimony of Amber Waight was played for the jury, it having been determined that Ms. Waight was unavailable for trial. Ms. Waight testified that on October 29, 2014, she and Lauren Oldfield were living with Ms. Ring on East Castle Street. The Defendant came to the house that night, and Ms. Ring told Ms. Waight and Ms. Oldfield to go to the bedroom. Ms. Waight heard the Defendant and Ms. Ring yelling, and then they came in the bedroom. The Defendant became physically aggressive toward Ms. Ring, "hitting her and yelling at her." The Defendant hit Ms. Ring "[e]verywhere" on her body using his "fists and his hands." The episode lasted ten or fifteen minutes. Ms. Waight said that she sat there and watched the ordeal "[b]ecause we told him that I was pregnant so he wouldn't come after me." Nevertheless, she was still "scared to death" and "thought he was going to come after [her]" next. For a time, she was "pinned between the dresser and the wall just shaking really bad."

Ms. Waight testified that the Defendant then walked out but came back in and continued to strike Ms. Ring. As he held a knife on Ms. Ring, the Defendant told everyone not to leave the room or they would "have to pay for it." Ms. Waight thought that the Defendant might come after her with the knife and "thought that [her] life was over." She believed that the entire ordeal, "[t]he whole beating and everything lasted for nine hours, but it was breaks in between." Ms. Waight recalled that, at some point, she was sitting on the couch with the Defendant sitting between her and Ms. Oldfield. She apparently fell asleep because she was awakened by the police at the door calling for her and Ms. Oldfield to come out. She believed that Ms. Ring escaped and went to McDonald's to call the police when everyone else fell asleep. When the police sent a "little robot" inside the house, the Defendant went to the bedroom, and Ms. Waight and Ms. Oldfield walked out. Ms. Waight testified that she never asked the Defendant if she could leave because she knew that he would not allow her to do so.

Ms. Waight said that she did not smoke crack cocaine with Ms. Ring or drink any alcohol that night. Ms. Waight recalled that another woman, whom she had never met before, was at the house that night. The other woman tried to calm the Defendant down at one point, but "[h]e just kept getting mad and mad and madder."

Officer Travis Henderson of the Murfreesboro Police Department testified that around 5:30 a.m. on October 29, 2014, he responded to a 911 call from McDonald's reporting that "[t]here was a lady that was banging on the drive-through and seemed to be upset." Officer Henderson located a woman matching the description given by the caller in a parking lot across the street from the restaurant. The woman was "visibly upset, crying . . . [and] kept talking quite a bit really fast as if she was stressed out." She

reported that she had been held hostage at a house on East Castle Street. Officer Henderson observed marks on the woman's face and called for an ambulance. After she calmed down, Officer Henderson was able to identify her as Ms. Ring. Ms. Ring reported that the Defendant had held her at knifepoint and had been "beating on her all night." Based on information provided by Ms. Ring, Officer Henderson directed officers to a house on East Castle Street, and he also went to the location after Ms. Ring left in the ambulance.

Officer Henderson testified that officers surrounded the house and spent more than an hour using a P.A. system to try to get the people inside to come out and surrender. When that did not work, Officer Henderson used a "mechanical breaching tool" to open the back door. Two women were in the living room, and they came outside when the officers called to them. The women advised that the Defendant had been on the couch with them, but he fled to the bedroom when the officers breached the door.

Officer Henderson testified that Sergeant Bryan Anderson deployed a tactical robot with cameras, microphones, and speakers into the house, but the tactic was unsuccessful. A team of officers then entered the house "to clear it room by room" and find the suspect. In the front bedroom, officers found the Defendant hiding under a pile of clothing on the floor. The Defendant gave a false name to the arresting officers.

Sergeant Bryan Anderson, with the Special Operations Unit of the Murfreesboro Police Department, testified in detail about the procedures used to remove the female hostages and the Defendant from the house on East Castle Street. Sergeant Anderson operated the robot and led the team that entered the house and apprehended the Defendant. Sergeant Anderson recalled that the Defendant was taken into custody with some difficulty and made no statements other than that he had been sleeping under the pile of clothes.

Officer Joshua Borel with the Murfreesboro Police Department testified that he discovered the Defendant when he stepped on a pile of clothes on the floor and noticed "something very hard" underneath the clothes. After the Defendant was secured, officers swept the house again to make sure there were no other subjects or weapons. Based on information provided by one of the victims, Officer Borel found a bent steak knife behind the TV in the living room.

Teresa Ring testified that she had been homeless from time to time but in October 2014, she had been living at the East Castle Street house for about three months. The house belonged to Freddy Wright, whom she had known for approximately seven years. Mr. Wright's brother and another man, "Paul," lived in a travel trailer in the backyard of the property. Ms. Waight and Ms. Oldfield, friends of Ms. Ring's who were also

homeless, had been staying at the house for a week or so. Ms. Ring had known the Defendant for sixteen or seventeen years but had not seen him in that many years until a week or two before the incident when she ran into him at a store. The Defendant told her that he needed a place to stay, and she invited him over to the house and they were "intimate . . . a couple of times." Ms. Ring did not tell the officers about her having been intimate with the Defendant because she was ashamed about it.

Ms. Ring testified that on October 28, 2014, Ms. Waight and Ms. Oldfield came over to the house around 6:00 or 7:00 p.m. They smoked marijuana until the Defendant arrived around 7:30 or 8:00 p.m. The Defendant stayed for a brief time and gave them some drugs before leaving. Ms. Murray arrived at the house around 8:00 or 8:30 p.m., bringing cocaine and marijuana with her.

Ms. Ring recalled that the Defendant wanted to "bring his baby's momma" to the house because she needed a place to stay, and Ms. Ring agreed to this because the Defendant was going to bring her drugs in exchange. The Defendant returned to the house around 9:00 p.m., but his companion remained in his truck while Ms. Ring told Ms. Waight and Ms. Oldfield to go to the back bedroom and be quiet. She did this because the Defendant told her that his companion would not stay if she knew that there were other women in the house. The Defendant gave Ms. Ring drugs and told her to stay in the back bedroom with the other women.

Ms. Ring testified that after being in the bedroom for about an hour, they all needed to go to the restroom. Ms. Waight, who was "like a child," could not wait. Ms. Ring was not sure about what to do, so she went to the living room to talk to the Defendant who was sitting on the couch with his "baby's momma." When the Defendant saw her, he got up, shoved her, and told her to get back in the bedroom. He started hitting her, and they argued all the way to the bedroom. He told her that she had "messed everything up" by leaving the bedroom.

Ms. Ring testified that the Defendant slammed the bedroom door behind them and began "beating on [her] and telling [her] that [she] . . . ha[d] been paid, and [she] should have stayed in the bedroom. And that he had to beat [her] to teach [her] a lesson." The Defendant hit her with his fists "[a]ll over [her] head and [her] breasts and [her] arms." Ms. Oldfield began to cry, and the Defendant started hitting her too. He then went after Ms. Waight, who was also crying, but stopped when Ms. Ring falsely told him that Ms. Waight was pregnant. The Defendant returned to hitting Ms. Ring and, with a beer bottle, threatened that "he was going to cut [her] face up and cut [her] all up with the glass." The Defendant then picked up a paring knife off the dresser and started "swinging it at [her], talking about how he was going to kill [her] and cut [her] up." He also threatened Ms. Oldfield and Ms. Waight, who were both "very scared."

-6-

Ms. Ring testified that the Defendant's "baby's momma" left the house after hearing the Defendant "beating on" Ms. Ring. The Defendant was angry because the woman sent him a text message telling him "it was over." The Defendant told Ms. Ring and the others that they "were really going to have to die," and the beatings worsened. The Defendant demanded money from Ms. Ring for "all the dope" he had given her, which was supposed to be payment for letting his "baby's momma" come to the house.

Ms. Ring testified that the Defendant continued to beat her. He "thr[ew] [her] down on the ground and ripped [her] clothes off of [her] and boot stomped [her]," causing her to urinate on herself. The Defendant would not let the women leave the bedroom, and, as a result, Ms. Oldfield had to use a trash can as a urinal. He specifically told them that they "couldn't leave the room or that he was going to kill [them]." The Defendant told Ms. Murray to "watch [them]" and make sure they did not leave the room. Ms. Ring thought that Ms. Murray followed the Defendant's directive because she was scared.

Ms. Ring testified that when the Defendant left the room, the women tried to find a way to escape. They yelled for "Paul" to come out of the trailer in the backyard and help them, to no avail. They also tried to kick out the air conditioner from the bedroom window but did not succeed. The Defendant heard the noise, came back to the bedroom, and started beating Ms. Ring again. She recalled that the Defendant "beat [her] almost the whole time that he was in [her] home."

Ms. Ring testified that Ms. Murray was allowed to leave after she "proved . . . her loyalty" to the Defendant by "beat[ing] up" Ms. Oldfield. After Ms. Murray left, the Defendant continued to beat Ms. Ring. Anytime the Defendant tried to hit Ms. Oldfield, Ms. Ring distracted him so that he would return his attention to her. At some point, the Defendant, still armed with the knife, moved the women to the living room from the bedroom. The Defendant later dropped the knife when he was distracted and using drugs.

Ms. Ring recalled that the Defendant "threw [her]" onto the couch in the living room and beat her "continuously" while she was on the couch. Ms. Waight and Ms. Oldfield were on the loveseat in the living room. The Defendant went to the kitchen at one point, and Ms. Ring used her inactive cell phone to make a 911 call. However, she did not know the address or any other way to identify her location to the operator. Shortly after she made the call, the Defendant returned to the living room and then took Ms. Oldfield back to the bedroom with him. While the Defendant was out of the room, Ms. Ring picked up the knife that the Defendant had dropped, bent it, and threw it behind the TV. Ms. Ring believed it was the only knife in the house. Ms. Ring said that she did

not leave the house while the Defendant was in the bedroom because she "was too scared," and the Defendant had left the door to the bedroom open.

Ms. Ring testified that, later, everyone but her fell asleep in the living room. After making sure that the Defendant was asleep, she tiptoed through the kitchen to the back door and ran barefoot to McDonald's where she asked for help. Ms. Ring then ran down the street in the direction of the police department. An officer saw her and pulled over to help. Ms. Ring gave the officer information about what had happened, and he called for an ambulance. At the hospital, Ms. Ring was diagnosed with a concussion, among other injuries.

Lauren Oldfield testified that she had been staying at the East Castle Street house for approximately a week at the time of the incident. She knew Ms. Ring and Ms. Waight from the homeless shelter. That night, Ms. Oldfield was upset because she and her boyfriend, "Paul," who was living in the camper in the backyard of the house, had broken up and his new girlfriend was staying with him. Ms. Oldfield, Ms. Waight, and Ms. Ring were hanging out, watching movies. The Defendant, whom she had never met, came to the house two times that night, the second time being "when everything happened." Ms. Murray came to the house between the Defendant's two visits, and the women all "smoked crack."

Ms. Oldfield testified that Ms. Ring told them that the Defendant was coming back with his "baby momma" and that they needed to go to the back bedroom when he arrived. Ms. Ring joined them in the bedroom a short time later with "some dope" that the Defendant had given her, and the women smoked some of it. Then, the Defendant came in the bedroom and started arguing with Ms. Ring because she "was being disrespectful to him." The Defendant told Ms. Ring that she owed him money. While they were arguing, the Defendant received a text message from "his baby momma" saying "she was done and she was leaving." The Defendant told them that they "were going to pay because she was leaving."

Ms. Oldfield testified that the Defendant started hitting Ms. Ring "[e]verywhere." She said that the Defendant also hit her "several times" because she was crying. Ms. Ring told Ms. Oldfield that "it was all [her] fault that he was mad because [she] was crying." The Defendant slapped her across the face and started punching her on the head, with one blow knocking her off the bed. The Defendant tried to turn his attention to Ms. Waight, but the other women lied and told him that she was pregnant in order to protect her. Ms. Oldfield said that the Defendant was armed with "a knife and a beer bottle." as he held the knife to Ms. Ring, he said that "he was going to cut her." The Defendant threatened to hit the women with the beer bottle.

-8-

Ms. Oldfield testified that Ms. Murray was "[j]ust kind of watching" the incident. Ms. Oldfield said that Ms. Murray did not try to calm down the Defendant and "was kind of on the side." Ms. Waight was sitting on top of a dresser, "crying so hard [the dresser] was shaking." Ms. Oldfield said that they tried to leave the room several times, but the Defendant would not let them. She had to urinate in the closet and in a trash can. The Defendant "beat[] [Ms. Ring] so hard, she peed on herself." The Defendant made Ms. Murray watch the other women and "not let [them] go anywhere." The Defendant took Ms. Oldfield's phone so she could not call the police.

Ms. Oldfield testified that the Defendant allowed Ms. Murray to leave, presumably because "they were friends." At some point, the Defendant made everyone go to the living room. He made Ms. Oldfield and Ms. Waight sit on one couch and "threw" Ms. Ring on another couch. The Defendant "roughed [Ms. Ring] up a little bit more" because Ms. Ring "kept setting him off by running her mouth." After the Defendant finished "roughing up" Ms. Ring, he told the women to go to sleep. Ms. Oldfield eventually fell asleep, but, before she did, the Defendant sexually assaulted her with his fingers. Ms. Oldfield said that, even though she fell asleep, she did not feel like she was free to leave. She fell asleep because she was "in pain" and "physically and mentally exhausted."

Ms. Oldfield testified that she woke up when the police called her and Ms. Waight by name over the loudspeaker and shined lights inside the house. The Defendant also woke up and "kind of freaked out." He looked around and realized that Ms. Ring was gone. The Defendant made Ms. Oldfield and Ms. Waight move to the back bedroom again and sit in the closet. The Defendant eventually moved them back to the living room and kept saying that he was not doing anything wrong and that the police could not come in the house.

Ms. Oldfield testified that, when the police returned, the Defendant told the women to pretend to be asleep and ran to the front bedroom. The police breached the house, and Ms. Oldfield and Ms. Waight went outside. Ms. Oldfield did not feel that she could have left the house voluntarily at any point prior to the police breaking down the door. Ms. Oldfield then described the injuries she sustained, which included knots on her head, bruises on her neck, and a "hand print" across her face. Her appearance prevented her from working for two weeks because her "boss didn't want [her] coming to work with a beaten up face."

Ms. Oldfield testified that the Defendant also threatened them by saying that he had a gun, but he never showed them one. Regardless, Ms. Oldfield "felt threatened just by the knife and the beer bottle." During the entire ordeal, Ms. Oldfield was in fear for her safety and was afraid to try to leave the house.

Officer Stephen McGowan with the Murfreesboro Police Department testified that he assisted with the arrest of the Defendant. The Defendant was transported to the police department for questioning, and he gave the officers a false name. The Defendant told Officer McGowan that he "only talk[s] to gold badges."

Detective James Abbott with the Murfreesboro Police Department testified that he interviewed the Defendant and the three victims. He noted that the victims were all "emotional" and "very upset." Ms. Ring and Ms. Oldfield had visible injuries. Detective Abbott went to the scene, where he took photographs and collected evidence. He found a bra and a pair of pants that appeared to be soaked in urine in the closet of the back bedroom. The pants, bra, a knife, and several beer bottles, among other things, were sent to the Tennessee Bureau of Investigation (TBI) for testing. No readable fingerprints were identified on any of the items. The TBI was not able to test the urine-soaked clothing for DNA.

### Defendant's Proof

Lacretia Ivy testified that she went with the Defendant to his friend's house around 11:00 p.m. or 12:00 a.m. the night of the incident. She recalled that she and the Defendant were about to watch a movie when an "older lady" came in the kitchen and started talking to the Defendant. The lady went to a back room, and Ms. Ivy heard arguing. The Defendant then "went back there to check on them." Ms. Ivy heard a female voice telling everyone to leave her house and another female voice saying that she "wasn't going anywhere." The woman who had said she wanted everyone to leave then said, "I'm going to stab her." Ms. Ivy left after hearing the last statement. She sent the Defendant a text message explaining why she had left. Ms. Ivy denied ever having an intimate relationship with the Defendant.

The Defendant elected not to testify.

### Rebuttal Proof

Detective Abbott testified that he interviewed Ms. Ivy over the telephone in February 2015. Some of the statements Ms. Ivy made during that interview contradicted her testimony at trial.

Detective Tommy Massey with the Murfreesboro Police Department testified that he talked to Ms. Ivy on speakerphone in the Defendant's presence on October 29, 2014, after the Defendant asked to speak with his girlfriend during his interview. A portion of the interview was played for the jury. At no point during the interview did Ms. Ivy state that she heard "a female voice saying that she was going to stab somebody."

Following the conclusion of the proof, the Defendant was convicted of three counts of especially aggravated kidnapping, three counts of aggravated assault, resisting arrest, and criminal impersonation.

## ANALYSIS

On appeal, the Defendant challenges the sufficiency of the evidence convicting him of especially aggravated kidnapping and aggravated assault. When the sufficiency of the convicting evidence is challenged, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); State v. Evans, 838 S.W.2d 185, 190-92 (Tenn. 1992); State v. Anderson, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. See State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." State v. Grace, 493 S.W.2d 474, 476 (Tenn. 1973). Our supreme court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

Bolin v. State, 405 S.W.2d 768, 771 (1966) (citing Carroll v. State, 370 S.W.2d 523 (1963)). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

To sustain the convictions for especially aggravated kidnapping, the State had to prove that the Defendant knowingly removed or confined the victims unlawfully so as to interfere substantially with the victims' liberty through the use of a deadly weapon.

-11-

Tenn. Code Ann. §§ 39-13-302(a); -305(a)(1). To sustain the convictions for aggravated assault, the State had to prove that the Defendant intentionally or knowingly, by using or displaying a deadly weapon, caused the victims to reasonably fear imminent bodily injury. Id. §§ 39-13-101(a)(2), -102(a)(1)(A)(iii).

The Defendant bases his challenge to the sufficiency of the evidence on the victims' lack of credibility. He argues that the victims were "high on drugs during the period of times the events took place" and that the victims previously had been convicted of crimes. He also asserts that some of the victims testified to things they had not told the police or testified inconsistently with one another. He further claims that the "proof and testimony never substantiated that the [victims] were not free to leave."

In the light most favorable to the State, the evidence shows that the Defendant terrorized the three victims, Ms. Waight, Ms. Oldfield and Ms. Ring, for hours by confining them to the bedroom and hitting Ms. Oldfield and Ms. Ring with his fists. He would have beaten Ms. Waight had the other women not intervened. Early in the ordeal, the Defendant was armed with a knife, which he used to threaten the women, and also used a beer bottle for the same purpose. All three victims testified that they feared for their safety. The women were not allowed to leave the bedroom, and Ms. Oldfield had to urinate in the closet. Even after the Defendant took the women out of the bedroom, they were not allowed to leave the house. Ms. Ring was only able to leave and summon help after the Defendant fell asleep. The victims' testimony established that the Defendant substantially interfered with the victims' liberty by the use or threatened use of a deadly weapon and that the victims had a reasonable fear of imminent bodily injury by the use of a deadly weapon. The Defendant's points of attack on the victims' credibility were heard and considered by the jury, which made its credibility determinations. The evidence is sufficient to sustain the Defendant's convictions for especially aggravated kidnapping and aggravated assault.

## CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
ALAN E. GLENN, JUDGE

-12-